UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| The Advisory Committee of MTS Systems Corporation Retirement Savings Plan and Trust, | Civ. No. 20-1435 (PAM/BRT) |
| Plaintiff, | |
| v. | **MEMORANDUM AND ORDER** |
| Linda L. Nelson and Rachel M. Swanson, | |
| Defendants. | |

This matter is before the Court on Defendant Linda Nelson's Motion for Summary Judgment. (Docket No. 47.) For the following reasons, the Motion is granted.

**BACKGROUND**

Richard Nelson participated in the MTS Systems Corporation Retirement Savings Plan and Trust ("the plan") through T. Rowe Price. (Plan (Docket No. 27) at 10.)[1] As ERISA requires, 29 U.S.C. §§ 1055(c)(1)(A)(i), 1055(c)(2)(A), the plan's terms dictated that Mr. Nelson's wife, Linda, would be the account beneficiary unless Mr. Nelson validly designated and Mrs. Nelson validly consented to a different beneficiary. (Id. at 31.) Mr. Nelson passed away on November 9, 2019.

**A. The Nelsons**

Mr. and Mrs. Nelson were married for 33 years. (Nelson Aff. (Docket No. 28-1)

---

[1] The parties filed voluminous exhibits en masse, rather than as separate exhibits. Therefore, citations to the record refer to the ECF page number, not the exhibit page number.

(ECF p. 40) ¶ 15.) Before they retired in 2009, Mr. Nelson worked as an electrical engineer for MTS Systems and Mrs. Nelson worked as a registered nurse. (Id. (ECF p. 41) ¶¶ 26-29.) The Nelsons had no children together, but Mr. Nelson had two children from a previous marriage. (Id. (ECF p. 40) ¶¶ 16, 17.) Although they resided in Eden Prairie for most their married life, the Nelsons spent much of their retirement at their lake home in Danbury, Wisconsin. (Id. (ECF pp. 40-41) ¶¶ 20, 30-32.)

Mr. Nelson suffered from alcoholism for years. He drank a significant amount of vodka every day of last six months of his life, which resulted in serious health problems. (Id. (ECF pp. 42-43) ¶¶ 38-44.) Mrs. Nelson described him as being in a foggy state and often drunk. (Id. (ECF pp. 44-45) ¶¶ 54-57.) In late October 2019, Mr. Nelson was admitted to the hospital due to a distended abdomen, significant swelling, and weakness in his legs. (Docket No. 31 at 64.) During this hospital stay, Mr. Nelson told his physician that he had been drinking a bottle of vodka every one or two days for about the last eight years. (Id.) Mr. Nelson was discharged from the hospital on October 27, 2019, and continued drinking. (Id. at 70.) He was readmitted to the hospital on November 1, 2019, for alcoholic hepatitis and abdominal swelling, but was discharged later that day. (Docket No. 29 at 36-41.) While in the hospital, a physician and Mr. Nelson discussed that his condition was terminal. (Id. at 41.)

**B.     Ms. Rachel Swanson**

The Nelsons became acquainted with Ms. Swanson when they hired her to replace the dirt driveway at their Danbury home in approximately 2009. (Nelson Aff. (ECF p. 51) ¶¶ 93-94.) Ms. Swanson owned a landscaping company, R&R Landscapes, with her then-

2

boyfriend.  (Id. ¶ 94.)  She performed odd jobs and landscaping work for the Nelsons over the years, and they became friendly.

During the spring of 2019, Ms. Swanson and Mr. Nelson developed a close relationship, often being alone together for hours.  (Id. (ECF pp. 51-52) ¶ 99-101.)  Ms. Swanson described her relationship with Mr. Nelson as that of a father and daughter, and they communicated nearly daily.  (Swanson Aff. (Docket No. 27-1) (ECF p. 100) ¶¶ 2, 6.)  Although Mrs. Nelson claims to have had reservations about her husband's close relationship with Ms. Swanson (Nelson Aff. (ECF p. 52) ¶ 104), Ms. Swanson remained involved in the Nelsons' lives, performing a wide variety of tasks for them—driving them places, doing their grocery shopping, managing outdoor work, and accompanying Mr. Nelson to doctor appointments.  (Swanson Aff. (ECF p. 100) ¶ 4.)

During this time, Mrs. Nelson believed that Mr. Nelson paid Ms. Swanson a $2,000 monthly retainer to help with landscaping work and odd jobs.  (Nelson Aff. (ECF p. 56) ¶ 124.)  However, unbeknownst to Mrs. Nelson, from July 2 to November 1, 2019, Mr. Nelson wrote checks for Ms. Swanson's benefit totaling more than $260,000.  (Docket No. 28-1 at 63-74.)

1. **Johnson Turner Estate Plan**

After learning from his doctor that his condition was terminal, Mr. Nelson began to order his affairs.  On November 4, 2019, he asked Ms. Swanson to drive him to Johnson Turner, a law firm, to discuss creating an estate plan.  (Swanson Aff. (ECF p. 101) ¶ 12.)  While at the firm, Mr. Nelson met with a non-attorney sales consultant and signed a retainer agreement and trust-based plan.  (Graf Aff. (Docket No. 31) (ECF p. 104) ¶¶ 3-5.)  Johnson

Turner also gave Mr. Nelson a draft estate plan to complete. (Id.)

Ms. Swanson filled out the draft estate plan form on Mr. Nelson's behalf and submitted it to Johnson Turner. (Draft Estate Form (Docket No. 30) at 41-48.) She listed herself as the beneficiary of Mr. Nelson's T. Rowe Price $3,000,000 retirement account ("the account"), which accounted for 92% of Mr. Nelson's assets, and all of the Nelsons' real estate. (Id. at 48; Docket No. 49 at 42.)

On November 6, 2019, two days after the meeting at the firm, Ms. Swanson drove Mr. Nelson to Marshfield Hospital to be seen for alcoholic hepatitis. (Nov. 6. Med. Records (Docket No. 29) at 42.) During the car ride, Mr. Nelson spoke on the phone with Ms. Samantha Graf, an attorney with Johnson Turner, about establishing an estate plan. (Graf Aff. (ECF p. 105) ¶ 11.) The call took place on speakerphone, and Ms. Swanson was present for the conversation. (Id. ¶ 11-12.) According to Ms. Graf, Mr. Nelson sought to place his assets in a trust for Mrs. Nelson and name Ms. Swanson the trustee. (Id. (ECF p. 106) ¶ 15.)

The information in the draft estate plan obviously conflicted with the information Mr. Nelson relayed on the phone call. Johnson Turner drafted Mr. Nelson's estate documents according to his instructions on the November 6 call. (Id. (ECF p. 108) ¶ 24.)

### 2. Beneficiary Designation for T. Rowe Price Retirement Account

Also on November 6, 2019, Mr. Nelson executed a beneficiary-designation form, naming Ms. Swanson the sole beneficiary of his retirement account. (Beneficiary-Designation Form (Docket No. 27-1) at 27.) Later that day, Ms. Swanson drove Mrs. Nelson to a notary so that Mrs. Nelson could sign a spousal-consent waiver on the

beneficiary-designation form. (Swanson Aff. (ECF p. 103) ¶ 18.) Indeed, Mrs. Nelson signed the spousal consent, agreeing to the designation of Ms. Swanson as beneficiary of Mr. Nelson's account. (Beneficiary-Designation Form.)

Mrs. Nelson and Ms. Swanson's versions of that day's event differ somewhat. According to Mrs. Nelson, she was crying at the notary's office because she thought Mr. Nelson was going to die any minute and did not want him to be alone. (Nelson Aff. (ECF p. 48) ¶ 76.) She also recalled that before entering the notary's office, Ms. Swanson showed her materials regarding a trust that Mr. Nelson was forming. (Id. ¶ 77.) Ms. Swanson, however, denies that Mrs. Nelson was crying and further denies showing her any trust materials. (Supp. Swanson Aff. (Docket No. 31) (ECF p. 19) ¶ 7.)

The change of beneficiary for the account went into effect on November 9, 2019—the day Mr. Nelson passed away. (Nelson Aff. (ECF p. 50) ¶ 88.) He was 72 years old. (Id. (ECF pp. 38, 39) ¶¶ 2, 13.) Mrs. Nelson was 68 years old when she was widowed. (Id. (ECF p. 39) ¶ 12.)

**C.     Appeal Process and the Committee's Decision**

On November 15, 2019, six days after Mr. Nelson's death, Ms. Swanson filed a claim for Mr. Nelson's account, requesting that its funds be disbursed and transferred to her. (Docket No. 27-1 at 53-69.) On November 20, 2019, Mrs. Nelson called T. Rowe Price, questioning the change in beneficiary. (Cmte. Decision (Docket No. 32) at 92.) Both women claimed to be Mr. Nelson's account beneficiary.

On December 21, 2019, the Advisory Committee ("the Committee") for the plan denied both Mrs. Nelson's and Ms. Swanson's claims to the account. (Docket No. 27-1 at

5

72-75.) Both parties submitted written requests for review of the plan's denials on February 24, 2020. (Id. at 84-95; Docket. Nos. 28-30; 30-1 at 1-76.) In her appeal, Mrs. Nelson admitted that she signed spousal-consent waiver but claimed that she did so only because Ms. Swanson used fraud and undue influence to convince her to sign. (Docket No. 28-1 at 15.) Both parties were given an opportunity to submit rebuttal and sur-rebuttal submissions. (Docket Nos. 31-1 at 71-76; 30-2; 31; 32 at 3-30.)

The Committee met four times regarding the claims to Mr. Nelson's account, ultimately concluding that "the spousal consent of Mrs. Nelson on the Beneficiary Designation obtained on November 6, 2019 is invalid based on undue influence and misrepresentation by Ms. Swanson." (Cmte. Decision at 91.) The Committee reversed its denial of Mrs. Nelson's claim and upheld its denial of Ms. Swanson's claim to Mr. Nelson's account.

**D.    This Lawsuit**

The Committee initiated this interpleader lawsuit to confirm its decision under ERISA that Mrs. Nelson is the beneficiary of her husband's retirement account. The Committee also seeks to recover attorney's fees and costs from the account.

Ms. Swanson filed a crossclaim against Mrs. Nelson, requesting that the Court declare her the account beneficiary and award her the benefits thereof. Mrs. Nelson moves for summary judgment and requests that the Court confirm the Committee's decision as to her rights to the account. (Docket No. 13.)

**DISCUSSION**

Summary judgment is proper if there are no disputed issues of material fact and the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and inferences that "may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." Enter. Bank v. Magna Bank of Mo., 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. Paine v. Jefferson Nat'l Life Ins. Co., 594 F.3d 989, 992 (8th Cir. 2010).

A.  **Standard of Review**

ERISA allows suits to recover benefits or otherwise enforce rights under a covered plan. 29 U.S.C. § 1132(a)(1)(B). Generally, a "denial of benefits . . . is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). There is no dispute that the Committee had such discretionary authority here.

"When an ERISA plan grants its administrator discretion to decide questions of eligibility for benefits or construe plan terms, judicial review of the administrator's determinations generally is limited to the abuse of discretion standard." Alliant Techsys., Inc. v. Marks, 465 F.3d 864, 868 (8th Cir. 2006). However, a less deferential standard of

review may be used if a claimant can show that "(1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty." Menz v. Procter & Gamble Health Care Plan, 520 F.3d 865, 870-71 (8th Cir. 2008) (quotation omitted).[2]

Ms. Swanson argues that a procedural irregularity exists because the Committee failed to conduct a full and fair review of her claim, as 29 U.S.C. § 1133(2) requires. Specifically, Ms. Swanson asserts that the Committee should have reviewed previous beneficiary designations and a recorded call between Mr. Nelson and T. Rowe Price, which demonstrate that Mr. Nelson wanted to make Ms. Swanson his beneficiary. (Swanson Opp'n Mem. (Docket No. 53) at 13-15.). This argument is unavailing; even if Ms. Swanson could demonstrate that Mr. Nelson intended that she be the beneficiary, Mrs. Nelson's valid consent was required. Ms. Swanson provides no factual or legal basis regarding any procedural defect in the administrative-appeal process before the Committee. Therefore, the abuse-of-discretion standard applies, rather than the less-deferential standard of review Ms. Swanson presses. (Id. at 15-18.)

Under the abuse-of-discretion standard, the plan-administrator's decision will be upheld "so long as it is reasonable and supported by substantial evidence." Roebuck v. USAble Life, 992 F.3d 732, 740 (8th Cir. 2021) (quoting Cooper v. Met. Life. Ins. Co., 862 F.3d 654, 660 (8th Cir. 2017)). "Substantial evidence is more than a scintilla, but less than a preponderance, of evidence." Sepulveda-Rodriguez v. MetLife Grp., Inc., 936 F.3d

---

[2] Ms. Swanson does not raise any argument regarding a conflict of interest.

723, 729 (8th Cir. 2019). "If substantial evidence supports the decision, it should not be disturbed even if a different, reasonable interpretation could have been made." Id. (quoting Johnson v. United of Omaha Life Ins. Co., 775 F.3d 983, 989 (8th Cir. 2014)). To evaluate the reasonableness of the plan-administrator's decision, a court looks to the record that was before the plan administrator at the time the decision was made. Farfalla v. Mut. of Omaha Ins. Co., 324 F.3d 971, 974-75 (8th Cir. 2003).

**B.     The Committee's Decision**

As an initial matter, the Committee acknowledged discrepancies in Mrs. Nelson and Ms. Swanson's version of events, and explained that it found Mrs. Nelson's testimony to be more credible than Ms. Swanson's. (Cmte. Decision at 96.) For example, Ms. Swanson claimed that she did not know the value of Mr. Nelson's account (Swanson Aff. (ECF p. 102) ¶ 14), yet she had listed the $3,000,000 account value in the draft estate plan that she submitted to Johnson Turner. (Draft Estate Form at 46-48.) Moreover, in the draft estate plan, Ms. Swanson listed herself as the beneficiary of not only the account, but also the Nelsons' real estate, leaving Mrs. Nelson to inherent nothing from her husband's estate.

Due to Mrs. Nelson and Ms. Swanson's conflicting recollections, the Committee relied on the testimony of three disinterested third parties. (Cmte. Decision (Docket No. 32) at 95-96.) The Committee reviewed Mr. Nelson's November 6, 2019, medical records, which included a physician's note stating that "Mr. Nelson has a 'friend', Rachel, who he intends to be his trustee for some of his property." (Id. at 96 (referencing Nov. 6. Med. Records at 42).) The Committee also examined the testimony of Ms. Graf, the attorney who drafted Mr. Nelson's estate plan on November 6, 2019. (Id.) Ms. Graf's notes reflect

9

that Mr. Nelson wanted to form a trust and that Ms. Swanson repeatedly interrupted Mr. Nelson, attempting to speak for him. (Graf Aff. (ECF p. 99) ¶ 12, (ECF p. 100) ¶ 15.) Also on that call, Ms. Swanson stated that she would not serve as the trustee for Mrs. Nelson if she was not compensated in some way for doing so. (Id. (ECF p. 101) ¶ 20.) Further, the Committee considered two affidavits from the notary public, but the Committee acknowledged that the affidavits provided conflicting information about whether Mrs. Nelson was crying while she signed the spousal-consent waiver and whether she was aware of what she was signing. (Cmte. Decision at 96.) The Committee's careful examination of relevant third-party evidence supports that the Committee did not abuse its discretion.

    1.    **Undue-Influence Test**

The Committee weighed the six non-exclusive factors outlined in <u>Alliant Techsystems, Inc. v. Marks</u>, No. 04cv3539, 2008 WL 906255, at *6 (D. Minn. Mar. 31, 2008) (Tunheim, J.), to determine that Ms. Swanson unduly influenced Mrs. Nelson's consent to the beneficiary designation. (Cmte. Decision at 94-95.) The Court considers the Committee's decision regarding each factor in turn.

        a.    <u>Mrs. Nelson's Physical and Mental Condition</u>

The Committee determined that Mrs. Nelson was "under extreme stress" when she signed the spousal-consent waiver, as she was concerned that her husband was dying. (Id. at 97.) Indeed, he died three days later. The Committee noted Mrs. Nelson's recollection that on November 4, 2019, Mr. Nelson mentioned that he was creating a trust for her. Further, Mrs. Nelson stated that just before entering the notary's office on November 6, Ms. Swanson showed her materials related to a trust, which aligned with Mr. Nelson's

November 4 statements. Other evidence corroborated Mrs. Nelson's assertion that she believed Mr. Nelson was creating a trust to benefit her and that Ms. Swanson was to serve as the trustee. The Committee's conclusion regarding Mrs. Nelson's physical and mental condition was reasonable.

      b.      <u>Whether Mrs. Nelson was Given Disinterested Advice</u>

Because Mrs. Nelson relied on Ms. Swanson for many daily tasks, the Committee determined that Mrs. Nelson had reason to believe that Ms. Swanson was helping her in bringing her to the notary. (Id. at 97-98.) Mrs. Nelson stated that she believed that her husband's death was imminent; thus, the Committee determined that it was reasonable for her not to take the time to call an attorney or an advisor. Substantial evidence supports the Committee's decision that Mrs. Nelson was not given disinterested advice about signing the spousal-consent form.

      c.      <u>Ms. Swanson's Role in Procuring the Benefit</u>

The Committee determined that "Ms. Swanson played a central role" in designating herself as Mr. Nelson's account beneficiary. (Id. at 98.) It noted that Ms. Swanson completed a draft estate plan for Mr. Nelson in which she listed herself as inheriting all of the Nelsons' real estate, as well as the T. Rowe Price account. That estate plan conflicted with Mr. Nelson's statements to his attorney, Ms. Graf. Additionally, Ms. Swanson filled out the beneficiary-designation form, drove Mrs. Nelson to the notary to obtain her spousal consent, and showed Mrs. Nelson trust documents in the car before they entered the notary's office. Ms. Swanson then mailed the form to T. Rowe Price. The Committee's decision that Ms. Swanson played an extensive role in procuring the benefit was an

11

eminently reasonable one.

####       d.      Whether Ms. Swanson Engaged in Coercive or Threatening Conduct

Although Mrs. Nelson did not allege that any coercion took place, the Committee found that the stress that Mrs. Nelson was under, coupled with Ms. Swanson's actions, indicated that Ms. Swanson "pressured" Mrs. Nelson to sign the spousal-consent waiver. (Id. at 98.) This was a reasonable determination.

####       e.      "Unnaturalness" Naming Ms. Swanson as the Beneficiary

Based on Mr. Nelson's financial generosity to Ms. Swanson, the Committee concluded that it may not have been unnatural for him to leave her the account. (Id. at 98-99.) Yet, the Committee reasonably found that it was unnatural for Mrs. Nelson to give such a gift to Ms. Swanson.

####       f.      Nature of the Relationship between Mrs. Nelson and Mrs. Swanson

Similarly, the Committee determined that neither Mrs. Nelson nor Ms. Swanson submitted sufficient evidence to establish that it would be natural for Mrs. Nelson to sign away her husband's entire retirement account to Ms. Swanson. (Id. at 99-100.) Indeed, substantial evidence supports the Committee's conclusion that it would not have been natural for Mrs. Nelson to give Mrs. Swanson the account.

Based on the six factors, the Committee found that the spousal-consent waiver on the beneficiary-designation form was invalid and that Mrs. Nelson is the beneficiary. (Id. at 91.) Ms. Swanson's arguments that the spousal-consent waiver are unpersuasive and contradicted in the record. Indeed, she presents no factual or legal basis to overturn the Committee's reasonable decision. Under ERISA, Mrs. Nelson is the rightful beneficiary

of her husband's retirement account.

**CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED that** Defendant Linda Nelson's Motion for Summary Judgment (Docket No. 47) is **GRANTED** and this matter is **DISMISSED with prejudice.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: Friday, June 25, 2021

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge
